Matter of John W. (2004 NY Slip Op 51885(U))

[*1]

Matter of John W.

2004 NY Slip Op 51885(U)

Decided on November 22, 2004

Family Court, Queens County

Richroath, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 22, 2004

Family Court, Queens County
In the Matter of John W. Children Under the Age of Eighteen Years Alleged to be Neglected by Mary W., Respondent.
N - 5171-99

Marybeth S. Richroath, J.
PROCEDURAL HISTORY
On April 23, 1999, ACS filed the instant petition against respondent mother alleging that she neglected the subject child by seeking unneeded medical attention for him and thereby placing him at risk of imminent harm. The case proceeded to fact-finding on October 28, 1999. The presentment agency began its case and the Court took testimony from Dr. Jerrold Schlessel, a neo-natalogist at North Shore University Hospital. After that testimony, the case was adjourned and ultimately resolved on January 20, 2000. On that date, respondent submitted to the Court's jurisdiction pursuant to Family Court Act Section 1051(a) with respect to the petition's allegations of inadequate guardianship and medical neglect. The medical records from North Shore University Hospital and NYU Medical Center were deemed in evidence as part of the 1051(a) submission.
The case was adjourned for disposition and the Court ordered that ACS provide the Court with an investigation and report and that the Court's Mental Health Services Unit ("MHS") evaluate respondent and provide a report to the Court. There were a number of issues related to respondent's release of her police personnel records, including medical evaluations relevant to her eventual retirement from the New York Police Department on a medical disability pension, to MHS. The MHS report was prepared by Dr. Christopher Mongeaux and presented in Court on August 16, 2000. At that time the Court released that report to ACS to update its investigation and report, and adjourned the case for disposition to December 6, 2000. On December 6 the case was adjourned with the notation in the Court's file, "parties to arrange evaluation by independent expert who has been unanimously agreed upon." The case was adjourned to April 4, 2001 for dispositional hearing with the express notation that the case could be advanced for settlement. Court notes show that on April 4, 2001, no evaluator had been agreed upon. On April 19, 2001, the Court issued an order directing that respondent be evaluated by Dr. Alex Weintrob. On October 16, 2001, when respondent had still not made an appointment to be evaluated by Dr. [*2]Weintrob, despite a number of interventions by the Court, her attorney was ordered to notify the Court and all parties whether she would be interviewed by Dr. Weintrob no later than October 19. At the same time, Dr. Weintrob was ordered to provide a report to the Court regardless of whether respondent was interviewed.
Respondent was never interviewed by Dr. Weintrob. His report was received by the Court on December 18, 2001, and the dispositional hearing began. Respondent and her attorney were present in Court. After the presentment agency completed its case, the hearing was adjourned to March 19, 2002 for respondent to present her case. On March 19, 2002, the case was adjourned again for respondent to be evaluated by Dr. Ruth Cohen. On July 9, 2002, the dispositional hearing concluded with the Court's receipt of reports from both Dr. Weintrob and Dr. Cohen. Respondent and her attorney were present in Court. The Court issued an order of disposition placing the child with the Commissioner of Social Services for a period of up to 12 months, requiring respondent to engage in and complete psychotherapy, to cooperate with referrals made by the agency, and to visit regularly with the child. The order also provided that only supervised visits were permitted by the Court, and directed the agency not to allow any unsupervised visits or trial discharge without a return to Court for a specific order.
Respondent engaged new counsel, and in December 2002 made a motion to vacate the fact-finding and dispositional orders because respondent had not been fully allocuted when she submitted to the jurisdiction of the Court pursuant to Family Court Act Section 1051(a). That motion was granted by order of the Court on December 18, 2002. On April 11, 2003 the Court on its own motion, recused itself from further deliberations on this matter and the matter was assigned to this part.
Respondent's attorney made a motion to preclude the agency from using the reports or testimony of Dr. Mongeaux or Dr. Weintrob at fact-finding, based upon Family Court Act Section 1047(b). On October 17, 2003 the Court granted that motion and precluded the testimony of both doctors. The presentment agency was given time to retain a new expert. Various trial schedules were set; however numerous obstacles impeded the start of the trial until September 9, 2004, when respondent made the instant motion seeking immediate return of her child pursuant to Family Court Act Section 1028.
1028 HEARING
The hearing on the 1028 application was held beginning on September 13, 2004 and continued on September 20, 27, 30, October 4, 7, 14, 15, 18, 25 and 28. The petitioner presented the testimony of Kathleen Tierney-O'Connor, M.D., Jerrold Schlessel, M.D., and records from North Shore University Hospital, the ACS investigation and the child's medical records from Lakeside Family and Children's Services. Respondent presented testimony from two retained expert witnesses, Phyllis Weiner, M.D. and Richard Dudley, M.D., and the current Lakeside caseworker, Lorraine Coleman. Respondent testified on her own behalf. Respondent also presented documentary evidence including the growth chart of the subject child; records from the child's early intervention at YAI; records of the child's hospitalization at NYU; records from the child's three Manhattan doctors, Flavia Marino, M.D., Heidi Leistner, M.D. and Anthony Orsini, M.D.; reports from Dr. Alex Weintrob, Dr. Henry Paul, Dr. Christopher Mongeaux, Dr. Ruth Cohen; respondent's police personnel records from NYPD as well as her release for them; a copy of an undated report on Munchausen's Syndrome by Proxy prepared by the Michigan Governor's [*3]Task Force on Children's Justice; a copy of the American Psychiatric Association's ethical guidelines, three letters from Court Attorney Douglas Forman, two reports and two letters from Lakeside Family and Children's Services. The Law Guardian did not present independent evidence.
THE PRESENTMENT AGENCY'S CASE
Kathleen Tierney-O'Connor, M.D.
Kathleen Tierney-O'Connor, M.D. was qualified as an expert in pediatrics and child abuse. She testified that on March 1, 1999, respondent came to North Shore University Hospital because her child had diarrhea for a number of days. The child was admitted for dehydration secondary to diarrhea. By March 3, 1999, the child's symptoms had resolved and staff spoke with respondent about taking him home. At that time, respondent protested that she could not take the child home because while in the hospital, he had suffered numerous apnea episodes, i.e. his breathing had stopped, and the hospital had done nothing to address this issue.
According to Dr. Tierney-O'Connor and the North Shore medical records, received into evidence, respondent reported a number of episodes at the hospital where the child turned blue or grey because he had stopped breathing. None of these episodes were observed by staff at the hospital. In fact, staff at the hospital noted that the child's color appeared quite normal. However, in response to respondent's complaints, a work-up was initiated, including a number of tests, all of which showed that the child was normal, and not suffering from apnea. Respondent's complaints continued, and the hospital put the child on one-to-one observation. During the three days he was on one-to-one observation, there were no observed incidents when the child stopped breathing. At that point, Dr. Tierney-O'Connor called in a report to the child abuse hotline, stating that it appeared that respondent suffered from a psychiatric disorder, Munchausen's by Proxy, in that she was seeking medical intervention for a non-existent disorder, apnea or episodes where he stopped breathing, that she claimed her son was suffering from.
North Shore University Hospital Medical Records 
The North Shore records outlined the subject child's medical history as recounted to them by respondent mother. She told them that the child had been born prematurely at NYU Hospital, and was currently on a monitor at home because he had an average of 3 apnea episodes per week. Late on March 1, 1999 she reported to one of the doctors that these episodes, which occurred about three times per week, lasted approximately 30 seconds and required minimal stimulation by the mother to return the child "to baseline." During this history, respondent reported that about three weeks prior to the child's admission, during occupational therapy, the child had experienced 30-45 seconds of shaking. As a result of this report, the doctor wrote that they should consider a neurology consultation in the morning to address the possible seizure episode. The child had significant pain and "inconsolable crying" during the night due to abdominal pain to the extent that the child was x-rayed at 3:10 a.m. on March 2, 1999. That test was negative, and on March 2, 1999 the nurse's note records that the patient was on the monitor and there had been no episodes of apnea the previous night. On March 3, 1999, the subject child was doing well, having experienced only one vomiting/diarrhea episode in the past 36 hours and the plan was to discharge him home. In the same note, "possible 2-4 episodes of apnea last night according to Mom," was recorded. The last line of the note states, "plan discharge to home." A further note from the same day shows that there was agreement to discharge the child home and [*4]do follow up tests on an outpatient basis; however, they requested a consultation from Jerrold Schlessel, a neo-natalogist and expert in apnea, or more accurately, apparent life threatening episodes. Dr. Schlessel examined John and took a history from respondent on March 3, 1999. In that history respondent reported to Dr. Schlessel that after his premature birth, John was discharged from NYU without a home monitoring device. Respondent noticed episodes where John apparently stopped breathing when he was about 5-6 months of age. Her pediatrician recommended a work-up by doctors at NYU, and they placed him on an in-home apnea monitor. The episodes diminished at about 13 months, but had recently begun again. Dr. Schlessel writes in his note, "[m]ost recently having clusters of events with apnea and cyanosis during sleep. While awake turns pale, then grayish/bluish, then becomes limp and goes off to sleep. Asleep briefly, no shaking arms/leg. Is having episodes 4-5 times per week." Dr. Schlessel performed a full physical examination of John, and wrote in his impression, "apparent life threatening episodes ... Von Muchausen's by proxy?? The mother fits some criteria, i.e. reports of multiple episodes requiring "CPR" seen by many M.D.'s, still on monitor at age 2 years, certain facile blase demeanor relating history, BUT appears to have warm, caring, loving relationship with infant." Dr. Schlessel's note was apparently the first time such a possibility was considered in writing. It is conceded by all sides that prior to the North Shore admission, none of the NYU doctors who treated the subject child documented such a possibility.
John W.'s Other Medical Records
Elsewhere in the medical records received into evidence at this hearing, John's full medical history was documented. It showed that he had been born prematurely and had remained in the Neo-Natal Intensive Care Unit ("NICU") for two months after his birth. While there he had suffered a number of apnea episodes, but the issue had resolved prior to discharge and he had been released home to his mother without any monitoring.
At about six months of age, respondent noticed that her child did not breathe for eight seconds while she was holding him, and she reported it to her pediatrician, Dr. Flavia Marino. Dr. Marino recommended a work-up by the premature infants' follow-up group at NYU ("preemie followup group"). Pursuant to that recommendation, respondent brought the child to Dr. Anthony Orsini at NYU, who performed a number of tests, and prescribed an in-home monitor. The subject child was on that monitor at home for about two months, from September through December 1997. While there was one documented incident of apnea during that time, when the child had been on the monitor for a month without incident, Dr. Orsini removed him from the monitor in December 1997.
In the midst of this monitoring, the child suffered an ear infection. Respondent brought the child to his pediatrician. Because the child was dehydrated, Dr. Marino had the child hospitalized. He responded well to intravenous fluids and antibiotics and was released home to his mother's care after three days.
The NYU follow up group had also diagnosed some delays in muscle development, and respondent took the child for physical and occupational therapy to YAI. According to respondent, in November 1998, one of the therapists reported to the mother that the child had a shaking episode while in therapy. Respondent reported this to Dr. Marino, who recommended that the child be seen by Dr. Heidi Leistner, a pediatric pulmonologist at NYU. Respondent took the child to Dr. Leistner, in December 1998 and Dr. Leistner placed the child back on the [*5]apnea monitor.
Meanwhile, Dr. Marino had informed respondent that she would not longer be accepting respondent's insurance, and told her that she needed to find a new pediatrician. Respondent had identified one, but had not yet made an initial visit, when the subject child suffered a bout of diarrhea. After consultation with that pediatrician, respondent brought the child to North Shore Hospital on March 1, 1999. Respondent told hospital personnel that the subject child suffered an average of six apnea episodes per week at home, but that she performed CPR on him, and was comfortable doing so because she had been a police officer in the past.
Jerrold Schlessel, M.D.
Dr. Jerrold Schlessel, a neo-natalogist who consulted on the this matter, was also called by the presentment agency. He testified that when he interviewed the mother she told him that the child suffered from apneic episodes multiple times per week, but that she resusitated him using CPR, and that she was comfortable doing so because she had been trained as a police officer. Dr. Schlessel testified that he was surprised at respondent's blase manner in discussing her son's episodes of apnea, given that these were potentially life threatening episodes. He also testified that to follow up on the mother's complaints, he had ordered a number of tests, one of which was a polysomnogram. He testified that in the midst of the test, the machine was observed to be on a setting that it would not automatically default to. He reported that he had been told by nursing staff that respondent had volunteered to them that she was not in the room when the computer apparently malfunctioned. All of these factors caused Dr. Schlessel to be very suspicious of the mother, and to write in his note in the medical records that respondent might be presenting a case of Munchausen's by Proxy, and that further investigation was necessary to either substantiate or rule out that suspicion.
Mental Health Evaluations of Respondent by Presentment Agency
Though respondent entered reports by Dr. Christopher Mongeaux, Dr. Henry Paul, and Dr. Alex Weintrob, the Court considers them on the petitioner's case. Dr. Mongeaux prepared two reports for the Court, one in March 2000, and the second in August 2000. The first report relied heavily on respondent as historian. Dr. Mongeaux found some significant disparities between her account and the limited collateral information he had available in March 2000, which in his opinion called into question her overall reliability. He recommended that the child not be returned to her, but that she be engaged in psychotherapy to address her internal dynamics and lack of insight. By the August 2000 report, Dr. Mongeaux had had the opportunity to review respondent's personnel files from the New York City Police Department. He concluded:
"The record review dealt only with the 10-year period involving her employment with the NYPD, but her previous account was so significantly at odds with available records that she could be considered completely unreliable. Given the rather global nature of her fabrications regarding this period of her life, it can be extrapolated that she is most likely engaging in fabrications regarding most other areas of her life and functioning. This is particularly the case regarding the issues and allegations in the present petition ... Taking the hospital records regarding the child into account, as well as the respondent's rather significant internal and interpersonal deficits and strong propensity toward self-serving fabrications and distortions, it is likely that the child was at significant risk in her care and would continue to be at risk if returned [*6]to her care." Respondent's Exhibit M2 at 4.
 It is noteworthy, that after Dr. Mongeaux issued his report, respondent never appeared again for an evaluation by an expert agreed to by the presentment agency. Though the parties were to agree on such an expert, and by April 2001 had apparently agreed upon Dr. Alex Weintrob, respondent was never interviewed by him, though adjournments for that evaluation were granted from April 2001 through October 2001. Dr. Weintrob concludes, solely upon a review of an extensive list of records outlined in his report, most, if not all of which are before the Court for purposes of this hearing, that "the data are consistent with, and strongly indicative of, a diagnosis of Factitious Disorder by Proxy, also known by the names Munchausen By Proxy, Munchausen Syndrome By Proxy, and Munchausen By Proxy Syndrome." Respondent's K in Evidence at 18.
Finally, the petitioner put into evidence medical records from Lakeside Family and Children's Services. These reports show that the subject child has not suffered from any episodes of apnea since removed from respondent's care. Nor has he suffered any incidents of dehydration requiring hospitalization or any hospitalizations at all.
RESPONDENT'S CASE
Respondent's Testimony
Respondent testified at length concerning her background, the facts which brought her before the Court as she saw them, and what has happened since the petition was brought. She testified that she grew up in a relatively intact family, with a "wonderful" father and a mother who, after the loss of respondent's brother who died of leukemia in childhood, withdrew emotionally and often physically from the family, and particularly from her daughter. Respondent testified that her mother was an alcoholic who was abusive to her, and stated that she disappeared for periods of time during her childhood.
Respondent graduated from high school and began working in the securities industry in 1980. She was promoted to various positions and was making a approximately $60,000 annually in 1985 when she decided that the market had peaked and she could possibly lose her job. Instead she quit, refusing offers of increased compensation from her employer to stay on, and started pursuing her education at CUNY's John Jay College. In 1988, she was sworn in as a probationary police officer in the New York City Police Department. She received a medal for excellent police service for reporting a bribery attempt while she was on her first assignment, and was assigned out of the Field Training Unit to the 20th Precinct in Manhattan.
On March 29, 1990, respondent testified that she had an incident where she was injured in an altercation with a perpetrator. She testified that she was hit multiple times about the face, neck and body with a huge piece of wood. Though she called for backup, there was no response and the perpetrator escaped. She returned to her post, but was sent for medical attention when a colleague came to check up on her. She was placed on sick leave for a period of time, and then restricted duty. While on restricted duty at the precinct house in April or May 1990, she slipped and fell, injuring her back, knees, hands and head. Respondent testified that she was pregnant by her first husband at the time she fell, and she started bleeding and ultimately suffered a miscarriage.
She testified that during the period July 1990 through July 1991 she was out on restricted [*7]duty occasionally due to her back injuries but otherwise was working hard and getting good evaluations. She stated that during the period July 1991 through July 1992, she was returned to full duty and was participating in some action related to the Crown Heights riots. She stated that while she and her partner were holding police barricades, the crowd broke through and she was injured again. Based on these various line of duty injuries, respondent testified that she suffered nerve damage to her shoulders and herniated discs and that by 1993, the NYPD had "surveyed her" for a medical disability. Respondent denied that she ever applied for disability. She contended throughout her testimony that the NYPD police surgeons were convinced that due to her many line of duty injuries she would be unable to return to full duty as a police officer and she would have to be retired on disability. Her ailments included nerve damage, reflex sympathetic dystrophy, and damage to her bladder requiring her to catheterize herself several times daily. She testified that there was no issue concerning the validity of her medical problems; the issue was whether the pension board would approve her for a line of duty pension. They ultimately did not approve that, but did grant her a regular medical disability pension. Respondent testified that she was approved medically for retirement in 1994, well before she became pregnant with John. Respondent also testified that she collects SSI for the same disability.
Respondent testified that after she became pregnant with John, she had some difficulties and was required to be on bed rest for much of the pregnancy. John was born prematurely at NYU Hospital on March 23, 1997, and went directly to the Neo-Natal Intensive Care Unit ("NICU") where he remained for about two months. The respondent suffered an adverse reaction to the epidural and was in a wheelchair for months after John's birth. Though John suffered some episodes of apnea and bradycardia while in the NICU, they resolved prior to his discharge home, and when he went home with his mother, he did not require an in home monitor.
One day while respondent was feeding John, when he was about 6 months old, she observed him drift off to sleep and she did not feel his chest rising and falling. She jostled him, and he awoke and cried immediately. Respondent brought the event to the attention of her pediatrician, Dr. Flavia Marino, who advised that the baby should have a work-up by the preemie group at NYU. Respondent took John to Dr. Anthony Orsini. As part of this evaluation, John was placed on a monitor at home. Respondent testified that she was trained in what to do if the alarm went off: stop, look and listen; if something is wrong and the child did not appear to be breathing, jostle him slightly; if that doesn't arouse him, jostle him a bit harder; if that still does not successfully arouse him, call 911 and begin mouth-to-mouth resusitation. John was on the monitor at home from approximately September through December 1997. Downloads from the monitor were examined by the group approximately monthly. According to respondent the first download identified two episodes, one a little more serious than the other. John did not suffer any further events, and Dr. Orsini discontinued the monitoring in December 1997.
 This evaluation also identified some muscular issues John had, and he was referred for early intervention at YAI, and received physical and occupational therapy there twice per week.
Respondent testified that when John was eight months old, he became ill with a cold, was cranky and crying and did not want to eat. She called Dr. Marino, and brought the child for an examination. Respondent testified that when Dr. Marino examined the child she noticed that his scrotum was shriveled, indicating that he was dehydrated. She admitted him immediately to [*8]NYU. He was placed on an IV and given some baby tylenol. He responded well and was discharged home after a couple of days.
Between December 1997 and November/December 1998, respondent testified that she and her son enjoyed a good relationship, but that other than twice weekly therapy at YAI and regular well baby care, there were no issues with John's health. Respondent testified that one of the times John was at occupational therapy the therapist reported to respondent that John had been shaking and was non-responsive. The therapist advised respondent to take John back to NYU to be evaluated. Respondent testified that she consulted with the preemie follow up group at NYU, but John was too old to continue using their services. They referred her to Heidi Leistner, M.D. a pediatric pulmonologist.
When respondent took John for the appointment, Dr. Leistner said that she had spoken with Dr. Marino and that based upon John's age, whatever he was experiencing was not apnea. She thought that there might be a neurological issue, or he could be suffering from reflux. She spoke with respondent about arranging testing at a location that would accept respondent's insurance. She instructed respondent to put John back on the apnea monitor, not because he had apnea, but because she wished "to monitor him." At about the same time Dr. Marino informed respondent that she would no longer accept her insurance, and respondent began to look for another pediatrician. She testified that she had identified Dr. Mistrada, who had offices close to respondent's home in Douglaston, but had not yet had a first appointment with him.
At the end of February 1999, while on the apnea monitor, John suffered from a bout of diarrhea, and was not eating or drinking. On March 1, 1999, respondent called Dr. Mistrada's office and reported her son's difficulties. She testified that Dr. Mistrada told her that he would meet her at the emergency room of North Shore Hospital. Respondent took John, with the monitor, to the emergency room of North Shore Hospital where he was admitted after diagnosis of a gastro-intestinal virus and dehydration. He was put on IV fluids, and suffered such pain during the first night of his admission that his abdomen was x-rayed at three o'clock in the morning. Respondent testified that John was hooked up to the apnea monitor at the hospital and that on his first day, he suffered no apnea episodes, but the alarm kept going off. During her testimony respondent indicated that the monitor kept alarming and was disturbing all of the other families, and that the care provided by North Shore was "horrendous" because the monitor kept alarming and no one came to take care of her son. She testified that she never told any of the staff at North Shore that her son was experiencing apnea episodes; she testified that she kept telling them that the monitor was alarming, and that the staff failed to react to those alarms. She recounted one occasion when the alarm rang for half an hour, and no one from the staff responded. When they finally did come, all they did was press the re-set button.
Respondent went on to complain that the staff made derogatory comments to her because her child was bi-racial, and claimed that the staff demanded that she prove to them that he was biologically related to her. Respondent testified that from day two of John's hospital stay through day four he steadily improved, despite the various problems at the hospital, and on day four the staff began discussing John's discharge plan. Respondent stated that she got her son all ready to go home, but that the North Shore doctors refused to let them leave until Dr. Schlessel saw her son. Respondent testified that Dr. Schlessel did come and examine her son, but not until 10 p.m. After Dr. Schlessel's examination, John was not discharged. Instead numerous tests were ordered [*9]to be done at the hospital.
Respondent denied vehemently that she ever reported to anyone at the hospital that John suffered any attack of apnea while in North Shore Hospital. She testified that Dr. Schlessel ordered the tests that she and Dr. Leistner had discussed, just on an in-patient instead of out-patient basis. She went on to complain that the technician who set up the polysomnogram dropped John and no one came to assist her or her son after he was dropped to the floor. Respondent also testified that there was a serious issue between respondent and North Shore staff around respondent's refusal to consent to an MRI for John under general anesthesia. Respondent testified that when she refused to consent to this last procedure, staff at North Shore threatened to make a complaint of child neglect against her. She testified that she believed the charges of Muchausen's reported against her by the hospital were in retribution for her challenging their recommendation that John receive an MRI under general anesthesia.
Respondent testified that although she constantly asked the North Shore staff if she could take her son home and have these tests on an out-patient basis, they denied her request and said that the testing had to take place in the hospital. She stated that on March 17, 1999, Dr. Tierney-O'Connor informed her that a report of suspected child abuse or neglect was being called in to the State Central Register regarding respondent. Respondent denied that Dr. Tierney-O'Connor ever spoke with her about John's history or conducted any physical examination of John. Respondent testified that after her conversation with Dr. Tierney-O'Connor she contacted Dr. Marino, Dr. Leistner and Dr. Orsini and that all of them were shocked at the action being taken by North Shore Hospital. Respondent stated that she had given the names of all of her Manhattan doctors and their contact information to the staff at North Shore and had been told that the North Shore staff were in contact with those doctors. Respondent testified that it was only after she spoke to those doctors after her conversation with Dr. Tierney-O'Connor that she was told the Manhattan doctors had never been contacted. Respondent admitted on cross-examination that she, herself, never called them until after March 17, 1999.
Respondent testified that once the petition was filed in Family Court, she hired an attorney, Steven Kommor, Esq., to represent her. He represented her from the point she realized, in the hospital, that a case would be filed against her, until the fall of 2002 when she retained Steven London, Esq.
Respondent testified that when it became apparent that ACS was going to request that John be remanded, they asked her for kinship resources. Respondent testified that ACS would only consider individuals biologically related to her; they would not consider close friends. Respondent testified that the only blood relation she could propose was her mother. Respondent testified that although she had a very problematic relationship with her mother, and although her mother had made racist comments concerning her son, was an alcoholic and had been abusive to respondent herself, respondent proposed her mother as a resource. Respondent stated that her mother was unwilling to take John and to convince her, respondent agreed to rent her a new apartment and pay her $250 per week. Respondent testified that while John was with his grandmother, respondent visited each day. However, there came a point in time when John reported to respondent that his grandmother was being mean to him. Respondent ultimately reported this to ACS, and testified that when she did so, her mother lied and stated that respondent had assaulted her. The grandmother showed bruises to the caseworker, and an order [*10]of protection was issued against respondent. Respondent offered into evidence a letter showing that the grandmother was on medication that could cause her to bruise easily.
After this incident, John was moved into non-kinship care. For a time respondent visited only at the agency, but presently she visits on a daily basis at the foster home.
Respondent also testified about the procedural history of this case prior to it appearing before this Court. She stated that she was horrified when during fact-finding her attorney, Mr. Kommor, admitted in Court that he had not reviewed the hospital records received into evidence at fact-finding. Respondent testified that shortly afterward she was present at a conference with a court attorney and her attorney and the court attorney represented to respondent that if she submitted to the jurisdiction of the Court, she would be examined by a psychologist and her child would be returned to her on the next adjourn date. Respondent testified that she did submit to the jurisdiction of the Court based upon that representation as well as her concern that her attorney was ill prepared for the trial of her case. However, respondent testified that she did not fire Mr. Kommor, or retain other counsel until September or October 2002, when she retained Steven London.
Respondent testified that she was examined by both Dr. Paul and Dr. Mongeaux, and she appeared promptly for those interviews. Respondent stated that she was never informed that she was expected to meet with Dr. Weintrob. She stated that although she called Mr. Kommor more than one hundred times during the period between April and October 2001, he never told her that she needed to meet with Dr. Weintrob. Respondent denied knowing that there was a court order requiring her to meet with Dr. Weintrob. Respondent stated that she was shocked when Dr. Weintrob's report was received in Court without an interview of her, and felt "she was being railroaded again."
Respondent stated that she engaged in sessions with Dr. Ruth Cohen from January 2001 through the summer 2003. At that time Dr. Cohen told respondent that respondent no longer needed her services though Dr. Cohen would be available to her if respondent felt that she needed support. Respondent testified that Dr. Cohen's report was provided to the Court in July 2002, and respondent's understanding was that Dr. Cohen would be testifying at the dispositional hearing. On cross examination respondent said that she did not remember consenting to any disposition on the case.
Respondent testified on cross examination that ACS, her attorney and the Law Guardian negotiated for months without successfully identifying a psychiatrist to examine her. When asked on cross-examination whether she would meet with a psychiatrist mutually agreed upon by all the parties, and be examined by that doctor, respondent testified that she would "defer to her attorney's advice." On cross examination respondent specifically denied the truth of many of the statements in the North Shore medical records.
Respondent's Medical Experts
Phyllis Weiner, M.D.
Respondent also called two expert witnesses: Dr. Phyllis Weiner, a pediatrician and expert in child abuse, and Dr. Richard Dudley, a psychiatrist. Both testified that respondent did not suffer from Munchausen's by proxy.
Dr. Phyllis Weiner was qualified as an expert without objection. She was a pediatrician for 41 years and chaired the Child Protection Committee at Jamaica Hospital for years. Dr. [*11]Weiner testified that she often testified on behalf of ACS; however, in this case she disagreed with their position.
Dr. Weiner testified that a diagnosis of Munchausen's by Proxy can only be made over months, if not years, and that it could not be identified, as she asserted it was by North Shore Hospital, over a period of hours or days. Dr. Weiner testified that Munchausen's was actually medical child abuse: the falsification by a caretaker, generally the mother, of symptoms that require a child to undergo medical testing that is completely unnecessary, because the child, in fact, is not suffering from any problem or disease. Dr. Weiner specifically distinguished a parent who might be overanxious about the health of his/her child because that child had a history of being legitimately sick. In Dr. Weiner's medical opinion, John W.'s history of prematurity, his history of apnea in the NICU, his history of requiring physical and occupational therapy to address hyper and hypotonia of his muscles, his history of becoming dehydrated and requiring hospitalization, his history of apnea and apparent life threatening episodes had made his mother anxious and that the doctors at North Shore inappropriately jumped to the conclusion that she was abusing the child. She was critical of the fact that while a number of the North Shore doctors wrote a "plan" to speak with the subject child's doctors and to secure and review his medical records, no one had done so prior to memorializing in the chart the suspicion of Munchausen's. Dr. Weiner's testimony was somewhat confusing in that she appeared to credit the mother's statements that she never told the doctors at North Shore Hospital that John suffered from apnea; she only told them that the alarm was going off. However, Dr. Weiner also testified that the respondent mother used the word "apnea" to describe everything that was wrong with the child, and she criticized the North Shore staff for taking that word at face value from a layperson and not questioning respondent carefully about what she meant when she used the term. In the same way, Dr. Weiner stated that North Shore staff should have queried respondent carefully about what she meant when she said that she was performing "CPR" on John. Dr. Weiner clearly credited respondent's statements that she meant "stop, look listen" and not the type of mouth to mouth and chest compression resuscitation a layperson would associate with the term.
Dr. Weiner specifically went through criteria associated with Munchausen's such as multiple doctors, multiple hospital admissions, admissions for diarrhea and stated that respondent did not fit those criteria. She stated that respondent mother had only engaged one pediatrician until managed care required that she change pediatricians. Dr. Weiner stated that the fact that John had seen Dr. Orsini and Dr. Leistner too did not count as multiple doctors because he had been referred to them by his primary care pediatrician, who had remained stable. In Dr. Weiner's experience, hospitalization for dehydration secondary to ear infection was very prevalent, and certainly not any indication of child abuse or neglect. She testified that ear infections were the most common problem bringing children to a pediatrician's office, and that in her practice she might see 900 such cases in a given year. She stated that approximately half would be children 0-1 year of age. Of those 450 infants, Dr. Weiner testified that in any given year she would hospitalize 200 for dehydration secondary to ear infection. In direct contrast, Dr. Tierney-O'Connor testified that while she also found in her practice that ear infections were the most common complaint, it was very unusual for a patient to become so dehydrated that the infant required hospitalization. She estimated a very small fraction of her patients had such an [*12]experience. In sum, Dr. Weiner credited respondent mother's version of events and found that she had in no way abused or neglected her son. Dr. Weiner was very emotional in her testimony supporting respondent's motion that her son be returned to her care.
Richard Dudley, M.D.
Dr. Richard Dudley, a board certified psychiatrist, also testified on respondent's behalf. He was qualified as an expert in psychiatry without objection. Dr. Dudley testified that while Factitious Disorder by Proxy, the name used in the Diagnostic and Statistical Manual ("DSM") for the syndrome also known as Munchausen's by Proxy, was a psychiatric disorder that could be diagnosed, it actually required collaboration between a pediatrician and a psychiatrist to make that diagnosis credibly. He testified that a multi-disciplinary approach was critical in order to effectively undertake a qualified medical review of the child's medical history as well as a mental health assessment of the caretaker's behavior. He testified that he collaborated with Dr. Weiner to that end. While the psychiatrist could look at the adult patient, the pediatrician would have to provide information concerning exactly what was happening to the child, and whether that appeared to support a fictitious disorder, or whether treatment for a particular disease or disorder might truly be warranted, regardless of the mental stability or instability of the parent.
Dr. Dudley testified that three diagnostic criteria were necessary to support a finding of Munchausen's: (1) the caretaker is creating symptoms of illness that do(es) not exist for purpose of getting medical care for the child; (2) there is no obvious secondary gain for the fictitious complaints, e.g. benefits or a lawsuit; and (3) the behavior is not better explained by some other psychiatric condition. With respect to the instant matter, Dr. Dudley was very clear that it was important to distinguish Munchausen's, which is the seeking out of unneeded medical treatment to gain approbation or other attention or approval, from malingering, where an individual is illegitimately seeking medical attention but for a very specific purpose. The examples he used to illustrate his point were an individual who fakes an illness in order to collect benefits from his/her job, or who fakes an injury to collect on a lawsuit this individual is malingering and not suffering from Munchausen's.
Dr. Dudley testified extensively concerning the record review he undertook preliminary to arriving at his opinion. It included review of the North Shore and NYU medical records, respondent's NYPD personnel file, the child's medical records from Doctors Marino, Leistner and Orsini, the reports by Doctors Paul, Mongeaux and Weintrob and various Court documents. Dr. Dudley testified that he interviewed respondent and consulted with Dr. Weiner. He did not consult with any of the doctors who treated John at North Shore Hospital.
Dr. Dudley concluded that respondent did not suffer from Ficititious Disorder by Proxy. The diagnosis that he came to was adjustment disorder, anxiety and depression. Dr. Dudley supported his opinion by stating that the medical attention sought by respondent for John was justified, and that she did not "doctor shop" but utilized the services of one pediatrician and then the various specialists to whom she was referred by that pediatrician.
Dr. Dudley went on to testify that there was no correlation between the medical attention one sought for oneself, and Munchausen's; in any event, his review of the police personnel records found that respondent's various medical complaints were supported by the police surgeons who examined her. Dr. Dudley testified that his review of the police records showed that respondent had various medical problems that traced back to her childhood and which were [*13]aggravated by injuries on the job. Thus, the issue, as he saw it, for the police department was not whether she was making up her illnesses; Dr. Dudley said that his reading of the police department records was that they documented her ailments. The issue was whether those ailments were as a result of line of duty injuries, and the ultimate determination of the police department was that they were not. Thus, respondent was retired with a regular medical disability and not a line of duty injury disability.
Dr. Dudley also emphasized that his review of respondent's police records showed that she was not psychiatrically discharged from the police department. It showed, it fact, that as outlined in Dr. Mongeaux's report, she had been psychiatrically evaluated and that her gun was never removed. Dr. Dudley interpreted that as a sign that the police department was untroubled by the results of that evaluation.
Dr. Dudley emphasized that Munchausen's is a serious psychopathology on the part of a parent, not an elective behavior and not manifested on a whim. He found no evidence in the two year period prior to John's admission to North Shore that indicated that respondent was seeking out medical attention inappropriately, or taking John for excessive and unnecessary doctor visits. Dr. Dudley attributed the problems respondent encountered at North Shore to tensions between her and the nursing staff based upon comments staff had made to respondent concerning her bi-racial child. Dr. Dudley credited respondent's recounting of these comments and also credited respondent's position that she never told the staff at North Shore that her son was suffering from apnea, she merely told them that the monitor was alarming.
Based upon his record review, interview of respondent and collateral interviews with Dr. Weiner, Dr. Dudley concluded to a reasonable degree of psychiatric certainty that respondent did not and never had suffered from Factitious Disorder (or Munchausen's) by Proxy. He recommended to the Court that respondent's application be granted and that John be returned home to his mother.
On cross examination, several hypothetical questions were put to Dr. Dudley. When asked if a mother told hospital staff that the child had apnea, and the child did not, and based upon her representation numerous tests were ordered on the child, Dr. Dudley said that such an set of circumstances would affect his opinion as to whether the mother was making false statements that would cause medical intervention to take place upon the child. Dr. Dudley allowed that if a parent had manipulated one of the machines that was testing the child, that could be consistent with a diagnosis of Munchausen's. He also agreed that if a child suffered from numerous ailments or numerous episodes of a given ailment and the caretaker was removed and the child no longer suffered from the ailment, such a set of circumstances would be consistent with Munchausen's.
Respondent's NYPD Personnel Records 
Respondent entered into evidence her personnel records from the New York City Police Department ("NYPD"). Respondent's F in Evidence. They included extensive documentation of her medical history, including a summary from 1990-1996, showing consultations and/or treatment by 14 different doctors and numerous different complaints. On October 25, 1990, Police Surgeon Cucco ordered an emergency psychiatric evaluation of respondent with the consequence of possible gun removal. The explanation on the form was "Member of service with recent miscarriage and family problems. History of back injury 3/90. Now admitted to [*14]Roosevelt Hospital and rule out possible hysterical conversion reaction." The only reference in the personnel records to any psychiatric evaluation at Roosevelt Hospital was a psychological study which was ruled invalid because respondent was attempting to conform and her answers were not judged reliable. There are references in the records to respondent's refusal to release the psychiatric evaluation to the NYPD. When questioned on cross examination, respondent stated that she did not need to release the report, the NYPD paid for it and was entitled to it. Clearly, according to the records in evidence, which do not include that evaluation, the NYPD was seeking access to it and there was no indication that such access was provided. In any event, the results of that psychiatric evaluation, for whatever reason, were not included in the personnel records received into evidence before the Court on this hearing.
Though the records do indicate that in 1996 there was an approval for respondent's "ordinary disability from neurogenic bladder," there is also a report dated 6/4/98, from Dr. Linda Lewis, a neurologist apparently asked by the NYPD to consult on respondent's case. While respondent's testimony and the testimony of her medical experts assumed the legitimacy of her medical issues, Dr. Lewis' report places them squarely in issue. Dr. Lewis chronicles respondent's medical complaints back to 1990. After her injury in March, she fell on a waxed floor in the station house and hit her head on May 7, 1990. She had a spontaneous miscarriage in June 1990. Between June and October 1990, Dr. Lewis documents "medical papers [which] reveal a series of complaints of headache, low back pain, neck pain, weakness in the legs, chronic constipation, difficulty with urination, forgetfulness, tinnitus, vertigo, falling and ataxia. In October 1990, EEG, BAERs and MRI of the lumbosacral and cervical spine were normal. She apparently saw several physicians." Dr. Lewis notes that respondent was admitted to Roosevelt Hospital in October 1990 and a complete medical and neurological evaluation was done. There were a number of diagnoses, including possible carcinoma of the thyroid which was investigated by biopsy in January 1991. Respondent returned to work in July 1991. On September 2, 1991, she was injured moving police barriers at a parade. In June 1993 she was admitted to NYU for "pyelonephritis." When they did a test requiring dye, respondent developed a hoarse voice, attributed to an allergic reaction to the dye. In June 1995, while at the scene of an accident, respondent stepped off a curb and had to "jump violently back" to avoid a car swerving in her direction. This caused her to suffer "whiplash of the neck and back. She had numerous tests in 1995 after this injury. In 1996 she began to document issues with her bladder.
Dr. Lewis performed a full physical examination and noted that in spite of respondent's various complaints about lower back pain and lack of strength in her extremities, her "gait is typical nonorganic with flexed hips and knees and dorsiflexed feet, slightly wide-based, a gait very difficult to reproduce without having excellent strength." Dr. Lewis directly impuned the integrity of respondent's various medical disabilities. She concluded, "[i]n summary today she has a sensory exam which is not anatomical, a motor exam which does not reflect weakness of a neurological nature, no overt evidence of reflex sympathetic dystrophy and neurological deficit detectable." Dr. Lewis does find that respondent was unable to work "at present." However, she concluded, "[t]his is due to her perceived disabilities which she dates from on the job injuries in 1990." Dr. Lewis concluded that respondent had no evidence of any neurological compromise related to injuries of March or May 1990.
Report by Ruth Cohen, M.D.
[*15]
Respondent also entered into evidence a detailed report from Dr. Ruth Cohen, a psychiatrist, who, according to respondent's testimony, saw respondent for therapy between January 2002 and the summer of 2003. Respondent's N in Evidence. Respondent testified on cross examination that she saw Dr. Cohen during this period of time sometimes weekly, then bi-weekly and then monthly, and that the sessions ended in the summer of 2003 because Dr. Cohen indicated to respondent that there was no longer any need for her to be seen. Respondent testified that she paid Dr. Cohen at a rate of $300 per hour. She also indicated that she continued to be in contact with Dr. Cohen, sometimes around paying her bills, sometimes because Dr. Cohen was checking in on her to provide her with support. Dr. Cohen provided a report dated July 3, 2002 and received into evidence at the hearing, which concluded that respondent did not suffer from Munchausen's by Proxy and that she enjoyed a warm and appropriate relationship with her son.
In that report, Dr. Cohen included some information from collateral sources with whom she consulted. These included another therapist, Dr. Leah Klungness, with whom respondent was in treatment at the suggestion of her attorney, Mr. Kommor, from October 1999 through August 2001. Dr. Cohen notes in her report that Dr. Klungness stated that their sessions ended due to financial issues and due to traveling distance between the doctor's office and respondent's home. Respondent noted on cross examination that she had paid Dr. Klungness $75 per hour for their sessions. However, it is noteworthy that Dr. Cohen included the following comment from Dr. Klungness in her report:
Dr. Klungness spoke of Mary as giving the 'continuing impression that she perhaps was unstable.' She said that on one occasion she recalled Mary saying that she was 'on the short list to become Police Commissioner,' which Dr. Klungness felt was an unusual statement. However, she said that nothing else that Mary said was inappropriate. Respondent's N in Evidence at 13.
As her last witness, respondent called her Lakeside Family and Children's Services caseworker, Lorraine Coleman. Ms. Coleman testified that respondent was completely cooperative with the agency, and interacted well with her child. Ms. Coleman believed that respondent's cooperation and progress in services warranted her having unsupervised contact with her child. On cross examination, Ms. Coleman conceded that respondent had never completed a full psychiatric evaluation through the agency.
DECISION
Respondent has made a motion pursuant to Family Court Act Section 1028 for the immediate return of her child, who has been held in remand by the Commissioner since April 1999. This was a highly contested proceeding with witnesses called who presented diametrically opposing versions of the facts. The Court fully credits the testimony of Dr. Tierney-O'Connor, the testimony of Dr. Schlessel, and documentary evidence received before the Court, including the medical records of the child from his various hospitalizations and treatment by various doctors, the YAI records, the reports of evaluations of respondent by Dr. Mongeaux and Dr. Weintrob, and respondent's NYPD personnel records. The Court had the opportunity to view the testimony of both of these witnesses, which was calm, measured and persuasive, though challenged repeatedly through cross examination. The testimony of the doctors, along with the medical records of John's stay in North Shore Hospital, present a persuasive case that respondent [*16]in fact made reports of alleged apnea episodes to medical personnel and that the course of care undertaken by North Shore was consistent with those reports and that history. Their report of suspected child abuse or neglect and the subsequent petition followed logically from the events as they unfolded at North Shore, along with the history that had been provided to North Shore by respondent.
The Court rejects completely the testimony of respondent mother as to any fact in controversy between the parties. That testimony was self-serving and completely contradicted or substantially called into question by much of the documentary evidence received at this hearing, and credited by the Court. For example, respondent's testimony concerning her childhood and relationship with her mother was completely and diametrically contradicted by the history of her childhood and relationship with her mother given by respondent to Dr. Mongeaux in 2000 and memorialized in his report. Respondent attempted to explain the contradiction by stating that it was important in 2000 to portray her mother as "good" so that ACS would continue John in kinship care where respondent would have daily access to him. Essentially, she testified that she lied in 2000 so that she could continue to have daily access to her son, and, if her testimony concerning the deterioration of that relationship is to be believed, placed her child directly at risk of abuse from his grandmother by those lies. Clearly, if her allegations about her mother are to be believed, respondent placed her own interests above the best interests of her child, and as a result he was abused.
Respondent's testimony about her work history is also less than credible. Her recounting of her work on Wall Street appeared exaggerated on its face, and her statements that she left a promising career because she thought the stock market had peaked, so she refused offers of increased compensation and quit without another job, appeared on their face less than credible and to leave out relevant and material facts. Respondent's career at the NYPD as explained in her testimony certainly did not match that documented in her personnel records. Full review of the police personnel records lead to a reasonable conclusion that respondent's tenure in the NYPD was marked not by a desire to advance within the department, as respondent testified, but rather to qualify for a line-of-duty injury pension and retire on 3/4's of her salary, tax-free.
The Court specifically did not credit respondent's assertions that she never told any of the doctors at North Shore Hospital that John suffered from apnea, merely that the alarm was going off. Respondent insisted throughout her testimony, that she never told anyone at North Shore Hospital that John suffered from apnea, or turned blue-gray, or stopped breathing. In direct contradiction to this testimony, the North Shore records are replete with history from respondent, making exactly those complaints. Respondent's testimony makes no sense, because if John didn't need the monitor, and it alarmed for no reason, why did she make it a point to travel with it to North Shore when she took him for treatment for the diarrhea? Certainly the North Shore doctors do not hook up every child who comes to their facility for diarrhea to such a monitor. There had to be a reason that they took such a precaution, and that reason is amply documented in the hospital records: respondent reported that John was suffering from apparent life threatening episodes regularly, sometimes as often as six times per week, and she was performing CPR to save him. Her denials that she made these reports are simply not credible.
Respondent's description of her interaction with Dr. Mistrada, when she called him to tell him that her child had diarrhea, are similarly not credible. What pediatrician who has never seen [*17]a patient before instructs the parent that he will meet her at the emergency room of a hospital so that her child can be admitted? While the Court does believe that respondent called Dr. Mistrada and he told her to go to the emergency room, her recounting of that conversation and her expectations of the doctor are contrary to common sense and simply not credible.
In the same way, respondent's statements that her attorney never told her that she should meet with Dr. Weintrob over a six month period of time, are simply incredible. Either respondent is lying and her attorney directed her to appear for the interview, and having experienced the report of Dr. Mongeaux respondent refused to go, or attorney and client were in league in a strategy to convince the Court to accept the evaluation of an expert respondent found more acceptable. In either event, respondent's version is not credible and the Court rejects it. Respondent's assertions that she entered a 1051(a) submission based upon a court attorney's representation to her that she would receive her child back on the next adjourn date are equally incredible.
Based upon these significant fabrications, the Court rejects entirely the respondent's testimony as to any fact in dispute between the parties. People v. Perry 277 NY 460 (1938).
The experts who testified on respondent's behalf, Dr. Weiner and Dr. Dudley, were clearly qualified in their respective areas. However, the fact that these two doctors were qualified as experts in their respective fields does not require the Court to accept, without question, their testimony or their opinions. To the contrary, controlling authority holds that it is incumbent upon the trier of fact to weigh the credibility of an expert's testimony in the same way that any other witness' credibility is assessed. In re Christine F. 127 AD2d 990 (4th Dept. 1987); Hopkins v. Wilkerson 255 AD2d 319 (2d Dept. 1998); People v. Hamilton 186 AD2d 581 (2d Dept. 1992); People v. Wood 12 NY2d 69 (1962); Grucza v. Waste Stream Technology 252 AD2d 901 (3d Dept. 2000). In conducting that analysis, the Court finds that their opinions essentially were based upon their acceptance of respondent mother's version of events. Dr. Weiner's testimony particularly became very emotional at points, to the extent that the Court became convinced that Dr. Weiner was not testifying as an expert on respondent's behalf, but instead acting as her advocate. It is interesting to note that one of the characteristics of Munchausen's, noted in the evidence before the Court, is that an individual who suffers from the syndrome often coopts medical personnel and turns them into advocates on behalf of that individual. The Court finds that respondent specifically coopted Dr. Weiner in this manner, such that Dr. Weiner testified that just less than half of the infants 0-1 year that she treated in any given year for an ear infection were hospitalized for dehydration secondary to that ear infection. The Court rejects that testimony as patently incredible on its face, and further evidence of Dr. Weiner's bias, and attempts to portray respondent's actions as reasonable.
Dr. Dudley's testimony is likewise rejected, after being given due consideration. While Dr. Dudley's testimony was much more measured, his conclusions were based on acceptance of respondent's version of events and also based upon Dr. Weiner's conclusions that the medical interventions sought by respondent were reasonable from a pediatrician's point of view. Having rejected respondent's testimony (which was essentially the same version of events credited by Dr. Dudley in reaching his conclusion) as well as the conclusions of Dr. Weiner, the Court also rejects Dr. Dudley's conclusion as unsupported by the facts as credited by the Court. The Court does credit Dr. Dudley's explanation of the diagnostic criteria for Munchausen's.
[*18]
The Court also notes with interest the emphasis that Dr. Dudley placed during his testimony on distinguishing Muchausen's from malingering. While Dr. Dudley proffered the opinion that his reading of respondent's personnel records showed that her various medical complaints to the NYPD were founded in legitimate medical issues, the Court reviewing the same documentation, reaches the opposite conclusion. The Court reads Dr. Lewis' report as a recommendation to the NYPD to concede to respondent's medical disability because based upon her eight year history of complaints, respondent would never return to full duty at the NYPD, not because she was physically disabled, but because she would continue in her crusade to find some medical issue that would support a pension. The Court finds that it is a pragmatic recommendation that it was not in the NYPD's interests to continue fighting, as opposed to a legitimization of respondent's medical complaints. In fact, respondent's argument in summation lends credence to this interpretation. Based upon the police personnel records, respondent was under medical care continuously from 1990 through 1998 when her pension was approved. Respondent argued on this 1028 motion that since her child was removed in 1999, she had not been hospitalized. Having received her pension, there was no need to continue medical intervention for her various, imagined, ailments.
The Court also rejects the opinion of Dr. Cohen, for much the same reason as Dr. Dudley's opinion is rejected. Dr. Cohen's opinion rests on her acceptance of respondent's version of her child's medical history. Dr. Cohen's opinion is also somewhat colored by the fact that respondent went to her for therapy on a regular basis for over a year and apparently paid her, or is indebted to her, for a substantial sum of money based upon those sessions. However, Dr. Cohen's report does have interesting comments which are noteworthy to the Court in reaching its ultimate determination. While Dr. Cohen, like Dr. Dudley, credits respondent's various illnesses as reported to the police department, Dr. Cohen also included in her report commentary as to malingering. Dr. Cohen states,
[i]n my review of the medical records, it appears that [Mary W.] was disabled because of multiple medical problems and injuries. She was unable to continue as an employee of the Police Department. This in no way reflects negatively on her ability to nurture and raise a son. It is also important to note that [Mary W.] does not suffer from Munchausen by proxy. To my knowledge, there has never been any study correlating feigned medical illnesses on the part of the parent with Munchausen by proxy. However, in the case of [Mary W.], the medical illnesses are legitimate and documented in the records. Respondent's Exhibit N at 15 (emphasis added) .
Clearly Dr. Cohen credits respondent's report of her injuries plus the NYPD grant of respondent's medical disability as "documenting" the credibility of those injuries/illnesses. However, as Dr. Dudley did, Dr. Cohen felt obliged to comment on the malingering aspect of respondent's personal medical history. The Court as outlined above, specifically rejects Dr. Cohen and Dr. Dudley's interpretation of the NYPD's grant of respondent's medical pension. It is left with colloquy by both experts concerning malingering and what that might mean to the ultimate disposition of this case.
The ultimate question for the Court to determine based upon the credited testimony and evidence in this case is whether respondent mother poses any imminent risk to the child. Based upon all of the evidence before the Court, the Court finds that the presentment agency has shown [*19]that respondent does pose a risk of imminent harm to the child and therefore respondent's motion is denied.
While much time has gone by since the inception of the case, there are very salient factors that show that the child was at risk in 1999, and remains at risk today. Though John was born prematurely and suffered from apnea in the NICU, that issue had resolved by the time he was discharged home. Thus, he was discharged without any type of home monitor.
When John, the subject child, was about 6 months old and in the sole care of his mother, respondent reported that she noticed him stop breathing. She reported this to her pediatrician and also to the preemie follow-up group at NYU. It is documented in Dr. Orsini's medical records, received into evidence. As a result of respondent's report, which was not observed by anyone else, John was subjected to two months of in-home monitoring and other evaluations and tests.
When John was 8 months old and in the sole care of his mother, he suffered from an ear infection, which his mother recalled as a cold during her testimony, and he failed to eat or drink such that he became dehydrated and was admitted to NYU. After a course of antibiotics to address the infection, tylenol for the pain and IV fluids to hydrate him, John began to eat and drink normally, and was released from the hospital back to his mother after about three days.
The preemie follow up group recommended that John receive physical and occupational therapy to address muscle development issues. Though Dr. Weiner testified that respondent took John to all appointments, the records show that their attendance was quite spotty, such that the therapists spoke to respondent about looking into having the therapy done at home since she apparently had difficulty transporting John to the facility. At least one incident where John was injured during a therapy session was documented in the records received into evidence. However, there is no mention in the YAI records of any incident where John became unresponsive and started shaking. In approximately November 1998, respondent reported such an incident to Dr. Marino, who recommended that John see Dr. Leistner. After the consultation with Dr. Leistner, John was placed back on the monitor, but though more than two months had gone by, with John hooked up to the monitor at least each night, there were no appointments yet for further testing.
In March 1999, while in the sole care of his mother, John suffered from diarrhea such that he stopped eating and drinking and became dehydrated. He was hospitalized, this time at North Shore. Respondent brought John to the hospital on the monitor. As outlined above, though respondent insisted throughout her testimony, that she never told anyone at North Shore Hospital that John suffered from apnea, or turned blue-gray, or stopped breathing, that testimony is rejected in favor of the facts recounted by Dr. Tierney-O'Connor, Dr. Schlessel and the North Shore medical records. As a result of that report, John was subjected to multiple tests and remained in the hospital for a protracted period of time.
In sum, during the less than two years the subject child was in her care, according to respondent, John suffered from apparent life threatening episodes on at least two occasions. Based on those reports by respondent, John saw three different doctors, was subjected to tests, and was placed on an in-home monitor for four months (in total). In addition, in the two years John was in respondent's care, he was hospitalized twice, at different hospitals, for dehydration secondary to common childhood ailments.
Even more telling, all of these ailments ceased when he was removed from his mother's [*20]care. Since in foster care John has not been hospitalized at all. Since in foster care, John has breathed normally and not suffered any apparent life threatening event. In fact, from the point at which North Shore placed John on one-to-one observation in an attempt to double-check respondent's complaints, John has not suffered any episode where he apparently ceased to breathe.
The parties spent a lot of time at the hearing attempting to establish or disprove that respondent suffers from Factitious Disorder by Proxy, also known as Munchausen's by Proxy. As outlined by Dr. Dudley, the diagnostic criteria include: (1) the caretaker is creating symptoms of illness that do(es) not exist for purpose of getting medical care for the child; (2) there is no obvious secondary gain for the fictitious complaints, e.g. benefits or a lawsuit; and (3) the behavior is not better explained by some other psychiatric condition. While the Court is not a psychiatric expert, and therefore has no comment with respect to criteria (3), it certainly appears that the facts bear out the first two criteria quite clearly.
Unfortunately, the presentment agency was deprived of important evidence that may have been probative with respect to criteria (3) and that was made available to respondent: respondent's cooperation with psychiatric evaluation. As outlined at length above, after being examined by Dr. Paul and Dr. Mongeaux, respondent failed to appear at any interview for a psychiatric evaluation arranged by the presentment agency. Thus, the only psychiatric evaluations including input from respondent available to the Court are those paid for by respondent. As outlined above, the Court has rejected the conclusions of those experts.
In sum, the Court finds that respondent created disorders requiring multiple medical interventions for her son during the two years during which he was in her sole care. By doing so she placed him at imminent risk. In the Matter of C. Children 249 AD2d 540 (2d Dept. 1998). Since that time, she has failed to cooperate with any psychiatric evaluation that would reliably test whether she suffers from a psychiatric disorder and what services or interventions could be put in place to address that disorder such that it would be safe for respondent to be reunited with her child.
Respondent, through the testimony of Lorraine Coleman, sought to prove that she had already fully cooperated with services and was ready to be reunited with her child. The Court gives little weight to that testimony by the caseworker, in the absence of a complete psychiatric evaluation of respondent by a neutral psychiatrist.
Given the serious nature of the allegations in the petition, the serious consequences suffered by her child while he was in her care, her failure to cooperate with a reliable psychiatric evaluation by a neutral psychiatrist and her clear fabrications and attempts to manipulate the outcome of this litigation, the Court finds that the child remains at imminent risk of harm if returned to respondent's care. Respondent's motion pursuant to FCA Section 1028 is denied.
Dated:November 22, 2004
Jamaica, New York
_________________________________
Marybeth S. Richroath
[*21]
J.F.C.